IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | |
|---|---|
| MATTHEW NICHOLS, ADC #107815 | * |
| | * |
| Petitioner, | * |
| v. | * |
| | * No. 5:16CV00216-SWW-JJV |
| WENDY KELLEY, *Director* | * |
| *Arkansas Department of Correction* | * |
| | * |
| Respondent. | * |

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Susan Webber Wright. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The details of any testimony desired to be introduced at the new hearing in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the new hearing.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing.  Mail your objections and "Statement of Necessity" to:

>  Clerk, United States District Court
>  Eastern District of Arkansas
>  600 West Capitol Avenue, Suite A149
>  Little Rock, AR 72201-3325

## **DISPOSITION**

### I.     BACKGROUND

In August, 2014, a Pulaski County jury convicted Mr. Nichols of capital murder after he set his fiancé on fire with gasoline.  The court sentenced him to life imprisonment with no possibility of parole.  (Doc. No. 8-2.)  He appealed and the Arkansas Supreme Court affirmed. *Nichols v. State*, 2015 Ark. 274.  The Court recited the horrifying facts of the case as follows:

> At the trial on August 25, 2014, North Little Rock police officer Jeffrey Elenbaas testified that on May 20, 2013, he was dispatched to 219 Waters Street in North Little Rock.  He believed he was responding to a residential fire, to assist the firefighters.  However, while he was waiting for the fire department, he was waved toward the driveway of the residence by a man whom he would subsequently learn was Nichols.  There he found a nude woman who had been severely burned, "basically lying in a heap in the driveway."  According to Elenbaas, "her skin was completely burned off," but she was still alive.
>
> Elenbaas further testified that Nichols approached him asking for permission to sit in the back seat of the patrol car because there had been what Nichols described as a "family disturbance."  He allowed Nichols to sit in the car, with the door open.  According to Elenbaas, there was nothing "real striking" about Nichols, but he did detect the smell of gasoline.  While Elenbaas was attending to the victim, Nichols left the police car and started walking down an adjacent street.  Meanwhile, bystanders approached Elenbaas and disclosed Nichols's involvement with the burned woman.  He went after Nichols and took him into custody.
>
> Franklin Hinton, a 15–year acquaintance of the victim, testified that Nichols and

McFadden lived together at the Waters Street house.  On the day of the murder, he had driven Nichols to an auto-salvage yard, returned with him to the residence, and was drinking a beer while watching Nichols install a brake caliper on his truck. According to Hinton, Nichols had been drinking also but was not intoxicated. Nichols tried to talk to him about his relationship with McFadden, telling him that he thought that McFadden was cheating on him.  Hinton claimed that he fended off the discussion, telling Nichols that it was not his business.

Eventually, McFadden arrived.  Hinton described her demeanor as "happy going." Nichols told him to wait for him while he went into the house to talk to "my lady." An argument ensued between McFadden and Nichols.  Nichols took her telephone, and Hinton tried unsuccessfully to retrieve it for her when Nichols came outside. Nichols went back into the house, and Hinton decided to leave.

As he walked back to his vehicle, he heard McFadden screaming.  He returned to the house because he thought Nichols was beating McFadden.  He discovered that the screen door was locked. Unable to see what was going on, he looked into the house from a window.  According to Hinton, he saw Nichols dumping gasoline onto McFadden, and "all of a sudden, the whole living room lit up."  He yelled at Nichols, but got no response.  He saw Nichols steadily pouring gasoline onto McFadden.  Hinton stated that he could not understand why the burning gasoline was not flashing back into the gas can.  When McFadden fell against the window where he was watching, he recoiled in horror and fell off the porch.  He ran from the scene and went straight home.  Hinton stated that he did not call the police until the next day.

. . .

Terry Yancy testified that she was Nichols's niece and McFadden's best friend.  She stated that a few weeks before the incident, Nichols told her that he would "bum[sic] her up in that house" if McFadden "put him out."  According to Yancy, she called McFadden and informed her about what Nichols had said.  Yancy also recounted a phone call that she received from McFadden on May 20, 2013, the date of the incident, asking her to bring her some locks because she intended to change the locks at her residence.  During that call, she heard Nichols's voice in the background.  Yancy claimed that Nichols repeated the threat that if McFadden put him out, "he would burn her up in that motherf- - -ing house."  She perceived that the conversation was interrupted by Nichols snatching the phone from McFadden. Yancy stated that she "sped through town about 80 miles an hour, trying to get to the house."  When she arrived, she found yellow crime-scene tape, blood on the sidewalk, and burn marks up to the house.  She went to the hospital and saw McFadden.  She recalled that McFadden's skin was "just burned and melted, and she had spots of hair and just skin."  Her whole body was "swollen and just melted together," and she was on "some kind of machine" that kept her alive just "long enough for us to see her or say goodbye."

3

Angela Yielding, a neighbor who lived two houses away from McFadden's residence, testified that she was asked by another neighbor to call an ambulance because McFadden's house was on fire. She called the fire department. She claimed that she saw Nichols take a gas can out of a vehicle and go into the house. Yielding "hollered at him" that his house was on fire. She then left. When she returned, she claimed that she saw Nichols pouring gasoline "on top of some figure." She further testified that she heard a noise that sounded like a "squelch or a scream" and saw flames. The figure was just lying on the ground in the fetal position. Yielding stated that she "saw the lady starting to roll off the porch and roll, roll, roll, roll and then until she stopped ... at the edge of the driveway." At that point, the person was no longer on fire. She observed Nichols walking around "like he had his chest puffed out." Yielding stated that she told police that Nichols was the person they were looking for. She observed Nichols walking away and did not want him to escape.

The State concluded its case with Dr. Adam Craig, an associate medical examiner with the Arkansas State Crime Laboratory. Craig testified he was not board certified in forensic pathology; nonetheless, he was qualified by the circuit court as an expert. Craig also admitted that he did not perform the autopsy on McFadden, but asserted that he did review the report that was authored by Dr. Dye, the pathologist who had performed the autopsy. Craig stated that the cause of death was determined to be "thermal injuries and smoke and soot inhalation." He reported that Dr. Dye estimated that McFadden sustained burns on 90 percent of her body. Through Craig, the State introduced several gruesome postmortem photographs of McFadden.

Nichols testified in his own defense. He claimed that he had consumed half a pint of gin on the day of the incident. He stated that when he saw McFadden come home from what was supposed to have been an appointment in Drug Court, he became upset because she was dressed inappropriately, wearing what McFadden referred to as her "hoochie mama clothes." An argument ensued, fueled by his accusations of her infidelity and her threats to call the police to take him to jail for a sentence that was pending against him for driving on a suspended license. He admitted that they fought over her phone and that he snatched the phone away from her. She called to Frank Hinton to help her, and although Hinton walked to the front of the house, he did not assist her. According to Nichols, McFadden told him that he meant nothing to her and that he was just a "trick." She taunted him, claiming that she had been with another man that day.

Nichols stated that he put McFadden's phone on top of the refrigerator and walked out of the house. He saw the gas can in his truck, picked it up, and went back into the house. McFadden saw that he was carrying a gas can, but the first words out of her mouth were, "Where's my goddamn phone at." According to Nichols, he "tripped" McFadden and doused her with gasoline. He then struck his lighter and "the flame went up." He saw Terry Brunch a few feet from his front door. Brunch shouted to McFadden, "roll NaNa roll." Nichols claimed that he did not plan to

burn McFadden before he became upset. However, when McFadden was putting out the fire, he poured more gasoline on her. But as she rolled back toward him, the flame "said woof" and flared up. It burned his face and hands and reignited McFadden. He threw the gas can at the front door. McFadden went into the bathroom, and he heard the shower come on. He started choking on the smoke inside the house and went outside. He started walking down the street and saw a police car approaching. He admitted that he told the officer that he needed to get into the car, and he climbed into the back seat. Nichols stated that he saw McFadden come out of the front of the house, cross the front of the yard, and lie down in the driveway.

Nichols stated that he did not intend to kill McFadden. He just wanted to "hurt her real bad." He explained that he poured additional gas on McFadden because initially he "hadn't hurt her in a way to make her unattractive, you know, for sexual purposes." He stated that he did not hesitate to pour more gas on McFadden because he realized he was "still going to go to jail" after the first dousing.

*Nichols v. State*, 2015 Ark. 274 at \*1-\*7.

Thereafter, Mr. Nichols, claiming ineffective assistance of counsel at trial, filed a timely petition seeking post-conviction relief under Arkansas Rules of Criminal Procedure 37. (Doc. No. 8-4 at 1-10.) The Pulaski County Circuit Court denied relief. (Doc. No. 8-6.) Before perfecting his appeal from that decision, Mr. Nichols filed the instant Petition for Writ of Habeas Corpus. (Doc. No. 2.) In his Petition, Mr. Nichols stated that he was trying to perfect his appeal but was "being hindered from doing so due to a state-created impediment preventing [him] from complying with the state-court procedures." (*Id.* at 4.) However, Mr. Nichols was granted permission to file his belated appeal so his federal habeas case was administratively closed pending the outcome of his appeal. (Doc. No. 16.)

On April 13, 2017, the Arkansas Supreme Court affirmed the trial court's dismissal of his Rule 37 petition. *Nichols v. State*, 2017 Ark. 129. Mr. Nichols was granted permission to reopen this federal habeas action (Docs. No. 17, 18) and this matter is now ripe for a decision.

In the instant Petition, Mr. Nichols makes mostly the same arguments he made in his Rule 37 petition. He argues he had ineffective assistance of counsel at trial because his lawyers: (1)

failed to investigate the victim's cause of death and obtain evidence proving he did not kill her; (2) failed to have the medical professionals who treated the victim as witnesses to testify she was expected to live and did not die as a result of her injuries; (3) failed to conduct an adequate investigation to show that the events described by witnesses for the State were not supported by the evidence; (4) failed to challenge the sufficiency of the evidence on appeal to show his conduct did not meet the "premeditation/intent" element of capital murder; (5) failed to object to improper statements made by the prosecutor during trial and failed to seek a mistrial based on these comments; (6) failed to obtain a handwriting expert to testify that a detective forged petitioner's signature on a consent-to-search form; and (7) failed to obtain phone records to impeach a witness. (Doc. No. 2 at 5-22.)

After careful consideration of the Petition, Response, and accompanying documents, for the following reasons, I find the Petition to be wholly without merit. Therefore, it should be dismissed.

## II. STANDARD OF REVIEW

Petitioner's claims have now been exhausted by the state courts. *Nichols v. State*, 2017 Ark. 129. So, in the interests of finality and federalism, federal habeas courts, under the AEDPA, are restricted to a "limited and deferential review of underlying state court decisions." *Sera v. Norris*, 400 F.3d 538, 542 (8th Cir. 2005). Under the AEDPA, federal review of underlying state court decisions are limited because federal courts may only grant habeas relief if the claim was adjudicated on the merits in the state court proceeding and the state court's decision:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005).

Under subsection (d)(1), a state court decision is contrary to federal law if the state court arrived "at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007). A decision involves an unreasonable application of federal law when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under subsection (d)(2), a state court decision will be based on an "unreasonable determination of the facts in light of the evidence presented . . . only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." *Lomholt v. Iowa*, 327 F.3d 748, 752 (8th Cir. 2003).

A state court's application of clearly established federal law must be objectively unreasonable, and not merely incorrect, in order for relief to issue. *Williams*, 529 U.S. at 404-05. Relief under § 2254(d) is authorized only when the petitioner can demonstrate the state court's ruling on the claim being presented was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement. *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786-787 (2011).

## III. ANALYSIS

In *Strickland v. Washington*, the United States Supreme Court established a two-element test for analyzing ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

7

> Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668 at 687 (1984).

Under the two-prong *Strickland* test, the benchmark for judging a claim of ineffective assistance of counsel must be "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Furthermore, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test . . ." *Id.* at 693 (citations omitted). "Courts also consider 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *White v. U.S.*, 341 F.3d 673, 677 (8th Cir. 2003) (quoting *Lockart v. Fretwell*, 506 U.S. 364, 369 (1993)).

In light of the gravity of the United States Supreme Court's decision in *Strickland*, it is hard to take Mr. Nichols's claims seriously. Mr. Nichols testified at trial he committed this heinous crime – albeit not to murder his victim but to *only* "make her unattractive, you know, for sexual purposes." *Nichols v. State*, 2017 Ark. at *6. Accordingly, I find his Petition to be frivolous.

Mr. Nichols's Petition is largely based on a theory that he is somehow legally innocent of capital murder because his intent was supposedly to maim and not kill (Claim 1). He further contends that the medical professionals and family members - who made the *excruciating* decision to end Ms. McFadden's suffering – are the ones responsible for her death (Claim 2). (Doc. No. 2 at 5-6.) The Arkansas Supreme Court addressed Mr. Nichols's legal argument head-on. On this point, they held:

> It is well settled that one whose wrongdoing is a concurrent proximate cause of an injury is criminally liable the same as if his or her wrongdoing were the sole

> proximate cause of the harm done. *Jefferson v. State*, 372 Ark. 307, 312, 276 S.W.3d 214, 219 (2008). In other words, Nichols is criminally liable for all the consequences that arose from his intentional actions, including the decision made by family and physicians to allow McFadden to die due to the nature and extent of the injuries that he had inflicted, which resulted in burns over ninety percent of her body. McFadden's medical records reflecting that a decision was made to withdraw further treatment would have been wholly irrelevant to a determination of Nichols's guilt. Furthermore, there is no substantiation for Nichols's bald assertion that the UAMS physicians would have testified that McFadden would have ultimately survived her injuries. Regardless, testimony from treating physicians would have emphasized the severity of the burn injuries inflicted by Nichols. Based on the above, any decision by trial counsel not to present evidence disclosing McFadden's medical care was clearly the product of reasonable professional judgment.

*Nichols v. State,* 2017 Ark. 129 at *3.

Mr. Nichols's claims here are baseless and, frankly, offensive. They should be summarily dismissed.

Petitioner further says, "The Trial Court used the State Habeas Corpus standard of review when it decided Mr. Nichols' Rule 37 petition, not the *Strickland* standard of review. . ." (Doc. No 17 at 2-3.) He is wrong. Although the trial court entitled the Rule 37 decision as being state habeas relief, the court clearly applied *Strickland v. Washington*, 466 U.S. 668 (1984), when rendering its decision. (Doc. No. 8-6.) More significantly, the Arkansas Supreme Court – also applying the *Strickland* standard – addressed Petitioner's failure to investigate claims (Claims 3, 6, 7) and concluded, "These allegations do not support an ineffective-assistance-of-counsel claim." *Nichols,* 129 Ark. at *6. I agree.

The Arkansas Supreme Court also correctly concluded Mr. Nichols's ineffective assistance of counsel claims to generally be conclusory. Citing well settled law, the court reminded Mr. Nichols, "The burden is entirely on a petitioner to affirmatively support an ineffective-assistance-of-counsel claim with factual substantiation sufficient to overcome the presumption that counsel was effective and to demonstrate that he was prejudiced by counsel's poor representation." *Id.*at

*7. "Nichols provided no substantiation to support his conclusory allegations that trial counsel erroneously failed to conduct an adequate investigation and effectively cross-examine the State's witnesses." *Id.* There is no fault in this finding as it is completely accurate and fully supported by the record.

With regard to Petitioner's claims about the prosecutor's improper statements at trial (Claim 5), the court held:

> A review of that partial transcript demonstrates that the prosecutor's remarks were based on evidence adduced at trial and the reasonable inferences that could be drawn from that evidence. Thus, there is no showing that an objection to the prosecutor's comments would have been fruitful. Furthermore, this court has noted that experienced advocates might differ about when, or if, objections during closing argument are called for since, as a matter of trial strategy, further objections from counsel may have succeeded in making the prosecutor's comments seem more significant to the jury.

*Id.* at *4.

The court's holding is correct and his claim is without merit.

Lastly, Petitioner's claim regarding his appellate counsel's performance (Claim 4) is also meritless. The Arkansas Supreme Court aptly concluded:

> It is well settled that premeditation and deliberation may be formed in an instant. *Pearcy v. State*, 2010 Ark. 454, at 6-7, 375 S.W.3d 622, 626. We have also explained that a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used, the nature, extent, and location of trauma inflicted, and the conduct of the accused. *Id*. Nichols claimed that he never intended to cause McFadden's death. However, a person is presumed to intend the natural and probable consequences of his actions. *Wyles v. State*, 368 Ark. 646, 651, 249 S.W.3d 782, 786 (2007). Nichols's own admissions that he retrieved a gas can from his truck, which he brought inside the home, tripped McFadden so that he could douse her with gasoline and set her on fire, and continued to feed the flames that had engulfed her provided sufficient circumstantial proof of Nichols's premeditated and deliberate intent. In view of the totality of the evidence, there is no demonstration that trial counsel's failure to allegedly discredit Yancey's testimony by examining her phone records prejudiced the outcome of the trial. For the same reasons, Nichols's contention that his appellate counsel had ineffectively failed to challenge on appeal the sufficiency of the evidence that supported his conviction for premeditated capital murder is

likewise untenable. Again, there was sufficient circumstantial evidence to demonstrate that McFadden's murder was premeditated. The failure to make a meritless argument on appeal does not constitute ineffective assistance of counsel. *Wooten v. State*, 2016 Ark. 376, at 6-7, 502 S.W.3d 503 (per curiam). The trial court did not clearly err when it concluded that the conduct of both trial and appellate counsel alleged to be deficient and prejudicial by Nichols was, instead, the result of reasonable strategic decisions and did not constitute ineffective assistance of counsel.

*Id.* at *11-12.

The facts of this case are damning. Mr. Nichols's lawyers performed admirably given the hand they were dealt. There is no question about Petitioner's guilt – factually or legally. Mr. Nichols had a fair trial and has been afforded justice throughout his criminal proceedings. Accordingly, I find no constitutional question and recommend this Petition be dismissed with prejudice.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A court may only issue a certificate of appealability "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Mr. Nichol's claims that his counsel was ineffective are wholly without merit, and he has failed to make a showing that his constitutional rights were violated. Therefore, a certificate of appealability should not be issued.

## V.   CONCLUSION

IT IS, THEREFORE, RECOMMENDED that:

1.   The Petition for Writ of Habeas Corpus (Doc. No. 2) be DISMISSED with prejudice.

2.   A certificate of appealability should not be issued.

Dated this 5th day of June, 2017.

_____
JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE